Frankel & Smith Beauty Departments, Inc. v. Commissioner.
Frankel & Smith Beauty Dep'ts, Inc. v. Commissioner
Docket No. 10507.
United States Tax Court
1947 Tax Ct. Memo LEXIS 156; 6 T.C.M. (CCH) 790; T.C.M. (RIA) 47187; June 30, 1947
*156 Saul I. Radin, Esq., 67 West 44th St., New York, N. Y., for the petitioner. Harold D. Thomas, Esq., for the respondent. OPPER
Memorandum Opinion OPPER, Judge: A deficiency in excessprofits tax determined against petitioner in the amount of $2,745.83 for the period January 1 to August 31, 1942, is placed in issue by this proceeding. Substantially all the facts have been stipulated or admitted by the pleadings. They are hereby found accordingly. Petitioner filed its tax return with the collector for the second district of New York. The present controversy is limited to petitioner's right to treat as borrowed invested capital certain payments called for under an "Agreement and Lease" entered into by it under the following circumstances: [The Facts] Petitioner, a New York corporation, is engaged in the business of operating beauty parlors in department stores in various parts of the country. Preliminary to the establishment of such a department at the Jordan Marsh store in Boston it executed the document in question August 2, 1939. Under that agreement the Jordan Marsh store (referred to in the agreement hereinafter recited as the Company) rented to petitioner *157 (referred to as the Operators) approximately 9,000 square feet of space in its annex for the purpose of conducting a beauty salon. Petitioner agreed that it would not operate competing departments. The rental carried with it light, heat, hot and cold water, and local utilities, together with janitor service, sales books, delivery books, elevator service, and other store facilities. Petitioner was permitted to advertise but only in the name of Jordan Marsh. Petitioner agreed to expend amounts varying from 3 to 5 percent of its annual volume of business on advertising, depending upon such volume. The contract further provided that: "5. It is contemplated certain changes, alterations, improvements and renewals may be made to the beauty salon herein provided for according to such plans as have been mutually agreed upon. The Operators agree to pay the cost of such changes, alterations, improvements and renewals not to exceed a total cost of $75,000. The Company agrees to finance the above changes in the first instance, and the Operators agree to repay to the Company the amount so advanced. "(1) $25,000 to be paid upon completion of the changes, alterations, improvements and renewals *158 and the balance to be paid in monthly installments during the term of this agreement, equal to 1/120 of the remaining balance plus interest at the rate of 3 1/2% per annum on the unpaid balance. "(2) At the expiration of this agreement the fixtures shall become the property of the Company. The operating equipment consisting of barber chairs, hairdressing chairs, hair dryers, manicure tables and chairs, permanent wave machines, electric refrigerator and appliances used in the work, waiting room furniture, etc., shall become the property of the Operators. In the event this agreement is terminated before expiration, all of the permanent fixtures and all of the operating equipment enumerated in this paragraph shall become the property of the Company, however, the Company agrees within thirty days to pay the Operators for each month of the unexpired term a sum equal to 1/120 part of the $25,000 initially paid by the Operators. It is further understood and agreed that in the event this contract is terminated before the expiration, the Operators will not be required to make any further payments or reimburse the Company for finances towards the cost of changes, alterations, improvements *159 and renewals." Petitioner agreed to maintain the fixtures and appliances above mentioned in a condition "at all times satisfactory to" Jordan Marsh; and petitioner agreed to replace at its own expense any time during the life of the agreement any fixtures or appliances equal in quantity and quality that needed replacing. If the department was enlarged, all necessary equipment was to be furnished at petitioner's expense. Petitioner agreed that it would carry a complete stock of hair goods for sale at retail price approved by the Company, which price was to be plainly marked on the merchandise. The agreement also provided: "The Operators agree to pay the Company eighteen and one-half percent (18 1/2%) of the gross receipts received for work done in said department, and also for all sales of merchandise made in the department." Petitioner also agreed that all of its employees in the department would be acceptable to Jordan Marsh and contracted for in its name through the employment department of Jordan Marsh; that petitioner's employees should conform to the rules and regulations applicable in the conduct of the business of Jordan Marsh. It was agreed petitioner should fix salaries, *160 commissions, bonuses, and gratuities for its employees and determine whether they were entitled to vacations, except that petitioner was required to maintain a minimum wage scale in accordance with the wage standard adopted by Jordan Marsh. It was further agreed that petitioner would conform to all law and regulations; that it would maintain a staff of employees sufficient in the opinion of Jordan Marsh to conduct the beauty department in an efficient manner; that uniforms required by Jordan Marsh of petitioner's employees would be acceptable to Jordan Marsh, and Jordan Marsh should not furnish them or pay for their laundry. Petitioner agreed to pay for all the goods and materials purchased by the beauty department and to incur no debts in the name of Jordan Marsh for the purchase price of any material. Jordan Marsh agreed to carry on its payroll all employees in the beauty department and distribute wages to them on the regular paydays of the Company, petitioner agreeing to reimburse Jordan Marsh monthly. The employees of the department were to enjoy all privileges of the store, with the exception of any profit-sharing or Christmas distributions. Petitioner's employees were to have *161 the privilege of membership in the Mutual Aid Association but restricted to its sick benefit payments. And it was agreed that petitioner, at its own cost and expense, effective the date of occupancy, would secure from insurance companies approved by Jordan Marsh workmen's compensation insurance, fire insurance on its property, public liability insurance, and other forms of insurance carried by Jordan Marsh reasonably applicable to the beauty department so that both parties would be entirely protected by insurance from any and all claims arising out of the business and occupancy of the beauty department. It was agreed by petitioner that adjustments which might be made by an executive of Jordan Marsh would be accepted as final by it, except as to matters covered by insurance. The wages and salaries of petitioner's employees and all incidental expenses of the department were to be advanced by Jordan Marsh and deducted at the time of settlement between the parties. It was further agreed that in the operation of the credit department charges and credits were to be given petitioner's customers, but not without first being referred to the credit department of Jordan Marsh, and then *162 only in the amount approved by such department; and that all cash sales in the beauty department would pass through the regular channels of Jordan Marsh. The agreement further provided: "The parties hereto mutually agreed that settlement shall be made by and between them monthly, on or about the twentieth day of each calendar month, for the transactions which have been made up to, and including, the last day of the previous month. From all monies received there shall be deducted: (1) Such sums of money as shall have been advanced by the Company as wages or salaries for employees of the Operators; (2) Such sums of money as shall have been advanced for other expenses, incidental charges, together with the proportionate cost of the advertising to which the Company may be entitled; (3) The sums of money advanced by the Company for the Operators for incidentals purchased for said department; (4) Such payments as the Company may be entitled to under Section nine (9) of this agreement; (5) Monthly payment applicable to fixture and improvement financing in Paragraph five, and the balance after such deduction shall be paid to the Operators." It was also agreed that Jordan Marsh would *163 not be liable for its failure to carry out its part of the agreement if such failure was due to conditions and occurrences beyond its control; and that Jordan Marsh would not be liable to petitioner or its employees for any failure to keep the premises in repair or for any damage done by utilities or steam pipes; and that Jordan Marsh would have no liability to petitioner for any alterations or improvements made by it in any part of the building. The agreement further provided that petitioner would not have the right to assign or sublet the premises or privileges covered in the agreement, except on prior written consent by the Company; that if the premises were rendered untenantable by fire or other reason, or if Jordan Marsh decided to discontinue business in the building in which the beauty department was located, the agreement was to terminate; but if the premises were only partially rendered untenantable, Jordan Marsh should have the right at its option within a reasonable time to place the building in suitable condition without the agreement being terminated and without liability on its part. And it was agreed that all merchandise of petitioner on the premises was at the sole *164 risk and hazard of petitioner. The agreement further stated that it was to commence November 1, 1939, and continue for a period of ten years; that the agreement could be terminated by the Company on sixty days' prior written notice at January 31, 1943, and at the expiration of each two-year intervals thereafter: And it was provided that: "If either party hereto shall fail to keep, observe and perform its respective covenants and agreements hereby made or any thereof, then either party may terminate this agreement by notice in writing to the party breaching the same provided that no termination shall be declared until the party committing the breach shall have been given notice in writing of such breach and shall have failed to remedy same within thirty days after the giving of such notice." And according to the agreement Jordan Marsh would have the absolute right to terminate it if the petitioner became bankrupt or insolvent or had a reeciver appointed, or made an assignment for the benefit of creditors. It was also agreed that if any new or modern appliances were required, Jordan Marsh would have the right to require petitioner to purchase them at their expense, it being *165 understood that petitioner would be given reasonable time to secure the appliances and the appliances required by the Company be within reasonable requirements for the conduct of petitioner's business; that such appliances were to be the property of petitioner; that any license or permit fees, profits or sales tax, or tax on petitioner's income therefrom or its merchandise or equipment were to be paid by petitioner; that petitioner assumed exclusive liability for the payment of employee taxes. And it was agreed that petitioner would have the Company harmless against actions, claims, liabilities, and damages, including infringements of trademarks, copyrights, and patents arising out of act or omission by petitioner in connection with the operation of the beauty department. And it was agreed if there was a statutory requirement that the name of the operator of the business be published that the contract would be terminated by Jordan Marsh at its option upon sixty days' notice. And it was agreed that customers' names and similar information was to belong to Jordan Marsh at all times and that petitioner would not conduct similar departments in any department store in Boston except *166 the two then in operation. Prior to the taxable year the $25,000 referred to in the agreement had been paid by petitioner. During the period January 1, 1942, to August 31, 1942, the amount of principal referred to in the agreement, remaining unpaid by petitioner as of each of the dates below, was as follows: January 1, 1942
$43,311.68
February 1, 1942
42,870.95
March 1, 1942
42,355.22
April 1, 1942
41,839.49
May 1, 1942
41,323.76
June 1, 1942
40,808.03
July 1, 1942
40,292.30
August 1, 1942
39,776.57
The average of the above unpaid amounts for the period January 1, 1942, to August 31, 1942, was $41,572.25. This is the amount petitioner claims to be borrowed capital. Under section 719(a)(1) of the Code this is permissible only if the indebtedness in controversy was "evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust." The classification urged as applicable by petitioner is that of a "note". [Opinion] It is no longer debatable that the legislative purpose in defining the permissible evidence of the claimed debt was restrictive. Journal Publishing Co., 3 T.C. 518. It *167 cannot suffice that there should merely be an indebtedness or even that there should be some written evidence of it. In the present case this amounts in effect to the necessity of our finding that the evidence of petitioner's indebtedness was a "note." This we are unable to do. The definition quoted in Journal Publishing Co., supra, is "A written promise to pay a certain sum of money at a future time unconditionally." It strikes one immediately that the amount to be paid as set forth in the contract is not "certain." No specific amount is stated, either as a whole or by months. True, there is a maximum figure but there is no showing here of what the improvements cost. And even if this record showed it, no one could determine from the contract itself how much of the maximum had actually been spent and hence was due to be repaid. Not insignificantly, it can be gathered from the figures in the stipulation that the current monthly payments were $515.73. Since the contract calls for each of such payments to be 1/120th of the whole, the amount apparently due, after $25,000 had been paid, was $61,887.60 - or considerably more than the $50,000 one would expect to be an outside *168 figure. It may be, of course, that the original amount, the monthly proportion, or the due dates, had been tacitly revised. But the task of locating a "certain sum," and the "future time" of its payment is not thereby rendered less impossible. This could easily dispose of the matter. But, in addition, it is apparent that the payments were not to be made unconditionally. Several obligations, at least, were imposed upon the store by the contract. It was required, for example, to avoid competition with petitioner, to supply facilities and services, to advance wages and incidental expenses. Either party could, upon unremedied breach by the other, terminate the agreement, and with it the necessity of petitioner's further monthly payments. A specified change in petitioner's management could have the same effect. If these "conditions" were breached, the payments might not be due. The present promise to pay was thus, like the one in Journal Publishing Co., supra, "an element in a bilateral contract and payment of the sums specified therein are in effect conditioned on the performance * * * of certain promises. * * * We are of the opinion that the contract in the instant case *169 is not a 'note' within the meaning of section 719 (a) (1) * * *." Decision will be entered under Rule 50.